Good morning, Your Honors. I'm Deputy Attorney General William H. Davis, Jr. for Respondent. And I'd like to begin with a few admissions and concessions, if I might. The other side's always happy. In the limited time that I had to prepare this appeal, I focused on protecting the AEDPA, which is basically the most important duty that we have as representatives of the State. But I believe somehow that may have distorted my focus in terms of addressing the findings of the district court. And I should really have focused on the fact that this was an abuse of discretion and that the district court committed clear error in accepting the claims of a petitioner in this matter. So in that context, I'd like to begin with Edward R. Fink. It's an unenviable position to be in where you have to defend an unscrupulous drug-using scoundrel, which was proven at the trial court level. And when you knew and didn't reveal, don't you think that also, if you talk about the burden, you knew he was unscrupulous? Well, it was brought out at trial. The defense counsel did an excellent job of pointing out his criminal history, his drug history. Well, I know, but if the defense counsel could point it out, the government could have known it. Well, the problem here is that it hasn't been shown that defense counsel didn't have all of the information now being presented as newly discovered evidence. In the first place, we're talking about three basic things. One, did he get held over in Long Beach pursuant to an agreement related to some conspiracy with Fink to frame this innocent man? This was simply an agreement to hold over the case that was pending against Fink, which was a much lesser matter, pending the outcome of this trial in Long Beach and holding him in Long Beach. That's one of the allegations as to what defense counsel failed to discover and what would have provided enough information to conclude that he had an agreement with the prosecution or the police to provide false testimony. The second one is the reduction of his grand theft charge or his robbery charge to a grand theft. And that, of course, was a case that preceded the instant crimes. So that has an effect on whether or not he had deals in the past. Well, we had enough cross-examination as to Fink's past and his willingness to inform on other people, his understanding as to how to get into somebody else's cell so that he could talk to them and provide information to the police. His history of getting benefits, all of that was brought out by defense counsel at trial. And now we're going to reverse this judgment 25 years later based on the possibility that defense counsel may not have known about this plea. The fact is, however, defense counsel specifically asked him about this plea during trial. The only thing that we're now presented with is a transcript of that plea where Petitioner attempts to find a conspiracy or an agreement within the context of the plea statement. We don't know if defense counsel had this transcript, but he knew about this case. We don't know what Petitioner's counsel had because at this point there are no records of what Petitioner's counsel had 25 years ago. Even Petitioner's own Strickland expert admitted we have no records of what trial counsel had or knew. But we do know that trial counsel specifically asked about that case during the trial here. Third, well, Petitioner, I mean, Mr. Fink claimed that maybe in a probation report he claimed that maybe, or I'm assuming that they dropped a warrant for me down in Orange County on some misdemeanor case. There's no connection to this case. It wasn't suggested that it was a part of a deal. It was just a benefit that he thought he might have gotten because, well, hey, I haven't been brought to court on that charge. Maybe it was something that they did for me. There's no specific reference to any evidence that shows that this was a benefit of a bargain. Those are the three elements of Petitioner's claim that there was a bargain. When I asked defense investigator Rierich if he had any specific evidence of an agreement, he said no. Well, how do you conclude there was an agreement? By reading the transcripts and looking at Mr. Fink's history, I drew the illusion that there was a bargain. Well, in the first place, yes. I don't think Mr. Fink ever did anything for nothing, do you? I don't think that it was his intention to do anything for nothing. But the question of whether or not he was out doing his best to help the police at every turn and whether or not he had an actual bargain in exchange for his testimony in this case are two different things. Fink was a Fink. That was what he did. That's how he got out of jail. That's how he had the police favorable to him. That's how the DAs – that's how he was able to work the DAs to get benefits and people overlook things. Sure, that was brought out at trial. Defense counsel nailed Fink about his history. He drew illusions as to whether or not there were bargains. This was something that was presented to the jury. This is not new evidence. But Fink said he told the jury that he didn't get any benefit from this testimony. Isn't that correct? He testified that he didn't get any deal. He did not enter into any agreement. Clearly, based on his past experience and based on his admissions, he knew that he got benefits in exchange for testifying against various people. But what was conveyed to the jury was that he didn't get anything out of this. True. And there's still no indication that he did get anything out of this. Perhaps after the trial, there were some benefits that came down. But at the time that he testified, he hadn't received any benefits. But if I was a juror, I would believe that this scoundrel is trying to get benefits. But the real question is, does it make any difference? Was Eddie Fink's testimony credible? And would it have been credible if we had known about the Orange County arrest warrant? Would it have been credible if we had known about some past plea bargain he entered where it was originally charged that he committed a robbery, but then we know that his M.O. was to scam people by going in the store and saying, would you like to buy that TV for 50 bucks? And they say, yeah, well, meet me out back and I'll bring it out back and deliver it to you. Well, the person in that case, when the police came to him, didn't want to admit that he was trying to buy a hot television. So he said, the guy robbed me. He later admitted that he had actually involved himself in a scam. And that is why he was offered a bargain of grand theft as opposed to a robbery. Why don't you talk about the eyewitness I.D.? Mr. Campbell. And I would also note that this Court, including Your Honor, in the past found that the whole Fink matter was suspicious, but still upheld this judgment regarding the very claims that we're dealing with here regarding Fink. Well, I tell you, we felt very uncomfortable. Yes, you did feel uncomfortable, and justifiably. I feel uncomfortable. I don't like standing here trying to justify Edward Fink's life. Unfortunately, 20 years later, he's now passed away, died in prison from AIDS, and my chief investigative officer, 20 years later, he's retired and living in Arizona and was not accessible to us for this evidentiary hearing. So we had a very difficult situation to deal with at this stage of the proceedings. In any event, Campbell is the linchpin of the district court's findings regarding all of these claims. Campbell's credibility is the basis of Magistrate Judge Block's determination that there was misconduct by the police regarding Fink, that there was ineffective assistance of counsel regarding Fink, that there was ineffective assistance of counsel regarding Campbell himself, and that Campbell's testimony, if they had known about this police misconduct, would have brought about a different result at trial. Unfortunately, Campbell's testimony at this point and his declaration regarding it is obviously not credible. This Court has a presumption that recantation testimony is greatly, should be treated with great suspicion. It's untrustworthy. And this particular declaration was very untrustworthy, which is probably why the state court rejected it originally, which brings me back to APA. But basically, he tries to do too much. It's like the criminal defendant that says, that dog Spot's not my dog. My dog Spot doesn't bite. And also, my dog Spot was protecting my property from someone who was trespassing. He's trying to prove too much. He wants to establish that the police coerced his identification. He wants to prove that if only counsel had come to me and talked to me before the trial, even though I had two opportunities at trial and at the preliminary hearing to present this information, I might have revealed this gross police misconduct. We have no, this is based purely on speculation, that he would have done that. Indeed, history, 20 years later, tells us that he would have been disinclined to do that. And, of course, the testimony itself is intrinsically and in every way inconsistent with his trial testimony, and he attempted in every way to avoid admitting that his trial testimony was untruthful to avoid any possibility of perjury or whatever. And it was obvious, because he would either not remember things, he'd become vague and ambiguous about his recollection, he couldn't even remember testifying at a preliminary hearing. His whole recollection of this case boils down to, the only things I can remember about those days was that they, the police became so frustrated with me during that process that I, you know, I frustrated them to the point that they grabbed a photograph out of the photo lineup and said, is this the guy? You know what's troubling about Campbell and why I think there is the general role on recantation that's less trustworthy, but here there's evidence that he immediately, after he testified at trial, made a statement to one of the lawyers, one of the prosecutors, saying that he had met Goldstein previously. Well, there's a lot of confusion about that point, because at this point, he won't even acknowledge that he recognized Petitioner way back then. He doesn't know that he recognized Petitioner back then. When I asked him specifically, because that was one of the corners I had him in, is, well, wait a second, you've testified, you've never recognized the Petitioner. They foisted him upon you and you tried to help out. And at the end of the interview that I conducted with you, you volunteered to me, oh, yeah, by the way, you know, defense counsel asked me at trial if I remembered an incident where the defendant helped me to move a couch. And at that point I couldn't remember, but, hey, if only he had asked me before trial about that incident, I might have been able to remember it and I might have been able to recall having met the Petitioner before, which may have influenced my identification of him. To which I said, does that mean, then, that you recognized Petitioner from the prior experience of him helping you with the couch? Oh, no, I'm not saying that. I never recognized him, even though he even admits to this day that he did recognize him, but it was unsure. But now it's because I'm in a corner, I didn't recognize him. And I said, well, what is the point of bringing up the fact that if defense counsel had only asked you about it, you might have remembered it? To which he responded, oh, it had no significance at all. Well, you're arguing his credibility. How do you deal with the Brady claim that, you know, none of this information about the identification procedure, information that the police had in their hands, was even disclosed to trial counsel? You mean regarding the misconduct in the identification process? Identification. Well, I guess we're sort of stuck with the fact that Campbell is now testifying that that's what they did. And I guess if the police knew about that, then, yeah, you'd have a problem with it. Although, even today he says, I recognized him, I identified him at trial, and I testified truthfully about that identification, but I wasn't sure. Well, hey, back at trial, defense counsel, who this Court has already acknowledged did a very competent job, and which, in the Thompson v. Calderon case, used this trial as an example of counsel doing a job that's above the bar of reasonable counsel. But this case is a little different, because counsel may have been, now that we've had this evidentiary hearing, counsel certainly could have been competent counsel, but he may have gotten his client off if the government had performed its obligations under Brady and Napoo. And we have to leap to the conclusion that the police actually did these things. But if we look at the testimony regarding the identification process itself, I inquired, do you recall, did you testify truthfully about the process of identification? Yes. Did you testify truthfully when you said that the entire process took two minutes? Well, I tried to be as truthful as I could, but I'm not clear about the time zone. Well, is it true that, as you testified, that it took you less than 30 seconds to identify the defendant in the photographic lineup? Well, I don't remember the timing of it, but I did testify truthfully. So what we're expected to do, I'm sorry, Your Honor. What's the bottom line? I think I follow your argument. The bottom line is that we're asked to believe that these police officers committed such a gross act of misconduct that they should themselves be imprisoned, that within a two-minute process they became so frustrated with their eyewitness that they coerced his identification of an innocent man. This is the same innocent man that Mr. Campbell not only identified at trial, but he drew a distinction between the photograph he was shown and his identification on the night of the murder. That's pretty detailed information regarding an identification you're not sure about. You're able to distinguish the difference between a photograph now and his appearance later and his appearance at trial. And yet I'm not sure about my identification. And that identification was made based on this police misconduct, even though when I first met the first police officer the night of the crime, I said, I am pretty sure I can identify this guy. And, oh, hey, let's not forget Ms. Shapiro, who brings this sort of back to Fink, because Fink corroborates Shapiro, who said a week after the murder, she saw a man who fit the general description of the man she had seen on the night of the murder and it also matched Petitioner's identification, came out of the garage with a shotgun or some instrument and fired it into the air. And, oh, hey, Petitioner told Mr. Fink that. But the important thing is that that ties Petitioner to the garage, it ties Petitioner to the shotgun, it ties Petitioner to the murder of Mr. McGinnis. Let me ask you another question. You conducted the evidentiary hearing. Yes, I did. Was there some reason that Detective Miller wasn't called to? He's retired and living in Arizona. He's still in Arizona. I could not find him. I tried going through personnel records. The Long Beach Police Department has no history of where he went after he left California. The only thing I got was from Detective Collette, who was his partner, was that he is retired and living in Arizona. And the prosecutor who prosecuted the state? He was long ago retired and was unavailable. We weren't able to locate him. I'm trying to remember. I remember searching for him, but I can't remember what the ultimate result of that was. But I wasn't able to get him to the hearing. It's a serious problem because we have no records. We have no defense counsel records. We have no real evidence of any improprieties by the police other than Campbell's testimony, which is very incredible. And we have no evidence of any misconduct by the police except for Campbell's testimony. In fact, if you look at Fink's testimony, Fink testified about money. And this goes to the district court's error. The district court found that there was no evidence supporting Fink's claim that the victim had a lot of money on him that night, and which I've pointed out in the objections. We had the victim's mother take the stand sometime after the murder, long time after the statement that Fink gave to the police, and she testified that on the morning that he was killed, he left the house with a substantial amount of money in a bag that he had attached to his jogging pants. He had a money bag, but she didn't know if there was money in it. She knew that he had enough money to purchase furniture. She knew that's what he was going to do. She became concerned because she saw a roll of money, and she said, you need to pin that to your pants or something or you're going to lose it. Sometime after the murder, when she gets the victim's car back, she finds inside the car the empty bag. No longer any money in it. And in that DA complete information form, the DA admits we don't have enough evidence to establish robbery. All right, Ken, so your time's up. Do you want to sum up? Yes, and I guess I'd like to get back to Fink, that not only did he have the thing about the money, but he also knew about a petitioner's need to get a new apartment, that he had been dropped from his apartment, evicted from his apartment, and that that was the motive for the crime. The district judge found that that's nothing that's ever been recognized as a motive for recantation. Common sense tells us that that could be a reason for recantation. I'm sorry. I'm mixing up my terminology. That's all right. If you want, you can have a couple minutes, Repuddle. Oh, that would be great.  Thank you. May it please the Court. Sean Kennedy on behalf of Mr. Goldstein, who was the defendant in the state criminal court and obviously was the successful petitioner in district court. Your Honors, in these times, the red habeas corpus has many detractors and critics, but this case demonstrates just how important federal habeas review is to our constitutional democracy. This is not a case where there is a rarefied question of constitutional law. Factual guilt is well established, but an interesting and important constitutional law question remains. This case is very different because the constitutional violations that occurred and were proven, in my view, go to the heart of the state court trial and the fact-finding process, and it is very possible, I would say probable, that a person has spent almost 25 years in prison for a murder he did not commit. And I say that for these reasons. It was not my intention to re-argue all the facts of the case to the court, because this is an appellate court. But the argument that has been presented by my colleague, and I don't mean any disrespect to him, is essentially a factual argument. It's the type of argument that is commonly made post-evidentiary hearing to the fact-finder, and it was made, and it was rejected. And what the court who heard the evidence and saw the witnesses found was this, that Thomas Goldstein's conviction rests on two slim leads. Number one is the testimony of Lauren Campbell, an eyewitness whose identification of Mr. Goldstein was contradicted by at least four other eyewitnesses, and I would say even more, and who came to court and explained how and why he made an identification that he didn't believe was fair or accurate. And two, that then that identification was buttressed by design by bringing in a jailhouse informant who is legendary in the Ninth Circuit. I mean, we have a death penalty case where a person was sent to execution when there were real questions raised about Edward Fink's veracity. And I would ask the Court to take that into account in this case. Is it clearly erroneous for Magistrate Block and Judge Tabrisian to find that Edward Fink lied about the quid pro quo for his testimony in this case when members of the Court have essentially raised the same question in past cases? I think the answer is no. And I guess I'll address the three different claims that we prevailed on, and if the Court has any questions, I'd be happy to try to answer them. But the first claim is a Brady claim. And I respectfully disagree with the characterization that nothing was proven regarding a quid pro quo relationship between State actors and Mr. Fink. Did I have direct testimony that Mr. Fink said that on the stand? No, I didn't. As counsel remarked, there's been a long passage of time, and he's passed away. And I couldn't call him. He's passed away. But I did present, I believe that the Petitioner presented, a compelling presentation of circumstantial evidence of a quid pro quo relationship. The fact finder found that the chief of police of the Long Beach Police Department wrote a letter to the district attorney asking that his cooperation be taken into account. And lo and behold, after that letter issues, someone who is facing six to three years in State prison for his grand theft, which began as an armed robbery, gets 58 days in the county jail. And the fact finder found that the chief of police of the Long Beach Police Department wrote a letter to the district attorney asking that his cooperation be taken into account. I think it's reasonable for the fact finder to find that that is an example of a sub rosa deal between the Long Beach Police and the DA to reward Mr. Fink for delivering testimony in this case. And after all, we know, it's undisputed, that when the case began, there's a deputy district attorney who writes a notation to the file saying this case was filed in haste. The investigating officer assures me it will get to the court. And I think that's a good example of a sub rosa deal. And it got better and the magistrate found that that happened. A sub rosa deal, I mean, the term since the Middle Ages has referred to a secret, undisclosed, unmemorialized deal. So yes, I have no smoking gun. That is true. But I do believe that Petitioner came as far as one can come in this context in proving that there was a sub rosa deal, and that's what the sub rosa deal is. I believe that the district court found. So I would respectfully say that unless that finding is clearly erroneous, Mr. Goldstein prevails on the Brady violation as to Mr. Fink. And the same applies to Mr. Campbell. There's been remarked about recantation testimony. I would respectfully disagree that Mr. Campbell's testimony is recantation testimony. I think what Mr. Campbell did was reveal that from the beginning he had problems with the identification, but tried to deliver in an effort to curry favor with the police, and that the police definitely knew that he had problems with the identification from beginning to end, and that they did not disclose that. Is timing significant in this case? I'm not sure I understand. The question? Well, I'm sure it's my mistake, but. No, no, no, no. It could be the way I phrase the question. This all happened more than a day ago, and yet we are just now here. Now, it takes a while to get here, but under the circumstances, is it a factor that it took so long? Yes, it is a factor. But I think it cuts both ways, because if you believe Mr. Campbell's testimony, it is a factor that it took so long. And the magistrate and district court did. The timing isn't just now, two decades after. The questions occur at trial and right after trial. Mr. Campbell remarks that even going into trial, he doesn't know who the person he's supposed to identify is, and that person is selected for him by the police officers. And then immediately after his testimony, he's again raising questions about his identification. Why is defense counsel asking me about prior incidents with Mr. Goldstein? Why are they doing that? And the police remark to him that Mr. Goldstein's position is that he's helped him move in. So from the beginning, I would say, and certainly immediately after trial, Mr. Campbell is stating things that are consistent with what he is stating now, which is that from all times, he had problems with identification and was pushed or pushed out of the case. He was either prompted or took it upon himself to exaggerate in order to please the police. But there is no contrary evidence at the evidentiary hearing to contradict Mr. Campbell's testimony. And I'd like to say that the fact that persons are retired or have moved to another state in the Southwest, I don't think that that's an appropriate answer to why those persons were not presented. As we all know, one case in which a person has moved to another state in the Southwest, they can seek a out-of-district subpoena to do a deposition of someone in another district if they're not willing to come. He said he couldn't find him. He knows he's somewhere in the state of Arizona, and so you charge him to find him even though he's somewhere in the state of Arizona, you think? Well, that's regarding the investigating officer, Detective Miller. We didn't hear that regarding the prosecutor. But I would just like to point out, and I don't mean any sort of conspiracy theory. I don't believe there's any evidence, sworn evidence in the record below, of attempts to find and subpoena Detective Miller. So the Brady claim was largely, it stands uncontested in the trial court. And the trial court, I think, had real, I mean, took this, its responsibility very seriously. It had previously denied the writ without an evidentiary hearing on some of the issues. They're not exactly the same, but, I mean, Justice Breeson had previously denied the writ. Now we get an evidentiary hearing. Mr. Goldstein has a lawyer. The people are brought into court. And the magistrate said that he found Mr. Campbell very credible, very conflicted about what he had done, very burdened by what he had done. And the testimony was not neat and clean, Your Honors. It was, it really had the indicia of truthful testimony, because he, when I say he, Mr. Campbell didn't give us everything we wanted. But he spoke how he viewed the facts. And what he said is that he went too far. He went too far. He made an identification that wasn't really based on what he saw, but what was based on what he thought the police officers wanted him to say. Now this all came up so late because of news reports about Fink? Yes. Once the grand jury report regarding the use of jailhouse informants in this county was issued, Mr. Goldstein petitioned a three-judge panel of this court for permission to file a successor petition. And they granted that. Are there many other cases like, involving Mr. Fink that are percolating around here on habeas? Because he had to, first of all, he did have to go through the whole state procedure, right? So he learned the new facts in 1990, and he had to do the state procedure and then get into the federal court. I'm just wondering if there's other cases percolating up, involving. I have looked, Your Honor, and I personally don't know of one I can tell you today. My investigator testified at the hearing that Mr. Fink had testified in ten other cases, and the magistrate found that to be true. But I'm not aware of anything this far in the system before the court, other than the cases that have already been cited in my brief, which is the prior panel's unpublished opinion in this case. And Thompson v. Calderon. The next thing I'd like to say is that it goes further than Brady, and this is really disturbing, because the magistrate found that not only were there Brady violations regarding both Edward Fink and Lauren Campbell, but at some point in time, we crossed the line into the knowing presentation of perjured testimony to the jury regarding Edward Fink. Or, probably more accurately, sitting silent, allowing it to go uncorrected. And the courts below took that obligation very seriously, and it was only because of notations in the file and strong circumstantial evidence that the district attorney's office had to have known about this letter from the chief of police of the Long Beach Police, Chief Stovall, that the court found that the deputy prosecutor sat silent while Mr. Fink testified that he had received no deals in connection with his testimony. That's a very serious constitutional violation, and it really calls into question whether or not this gentleman is guilty at all, because it was clear to the courts below that there was a big investment in this case, and there was a big investment in having Edward Fink testify in this case. The actors who are prosecuting the case view Lauren Campbell's testimony as slim or weak. They must have. Because if they didn't, why was there such a push to have the jailhouse informant a testimony to supplement the presentation? Why would one say this case was filed in haste? The investigating officers assure me it will get better. And there are other notations that are referred to in the magistrate's report where they refer to Edward Fink, the deputy district attorney's, refer to it as his testimony is essential, very important. And so when we have a jailhouse informant who is falsely testifying on the stand in the trial, and no one sees fit to stand up and testify, that is a second independent and really glaring constitutional violation that is representative of the type of constitutional violations that lead to wrongful convictions. And the final factual finding, so again, that's subject to clearly erroneous review. And while I think my colleague makes very good and passionate pleas for a contrary finding, I would respectfully ask the Court to apply the appropriate standard of review and defer to the judges who actually sat through all of the testimony and saw the witnesses and heard them testify and heard the arguments also. For example, you know, there are many references today about why Mr. Fink had to be telling the truth, because he knew things that nobody else knew. And he knew that this murder was motivated by the desire to steal money. The magistrate termed that, and I don't know what to say other than to use what he said, disingenuous, that he thought it was completely circular, that you should believe Edward Fink, because Edward Fink has told us these things. He didn't see it the way it's being argued today. And it's his role to make that factual finding, and he did. The final claim, we're now on our third constitutional claim, which is that Edward Fink's testimony was disingenuous. The final claim is ineffective assistance of counsel. And I want to make it clear to this Court, because I don't think it's so clear in some of the briefs, is the claim of ineffective assistance of counsel is not a rehash of the ineffective assistance of counsel claim that was litigated and lost in the first petition. We did not attack Mr. Paredes' representation for a defense lawyer and impeach Edward Fink. I think he did an admirable job with the best that he had. Did I tender an ineffective assistance of counsel claim for him based on another reason? Yes. And it's a very humbling experience to do it when you're a defense lawyer, but it has to be done. And it related to something totally different than what's being argued today. We argued that Mr. Paredes had a duty in this particular case to try to interview the sole eyewitness who claimed that Mr. Goldstein shot the victim. And it isn't in a vacuum. It wasn't that in every single case, the defense lawyer has to question every witness. It's you have one witness who stands alone and says that it's Mr. Goldstein who is Caucasian, and you have numerous other witnesses who identify a different shooter. They identify the shooter as African American or Latino, and they provide very different descriptions of the person that this one eyewitness is talking about. Against that background, the Strickland expert testified that defense counsel had an obligation under the standard of care at that time and really any time to at least attempt to interview this gentleman. And Mr. Campbell testified that if he had been approached, he may very well have revealed the information about his misgivings. And, you know, it's a hard sell sometimes, so you have to ask why. But he answered why. He said, Mr. Campbell said, that even if it was hard to understand, he would have felt more comfortable saying that in a setting where the police officers and the victim's family were not there because they were trying to get information because he didn't want to let him down. And although I keep saying that facts are not really appropriately argued in the appellate court, I think there's a real indication that we ought to believe him, because when Petitioner's lawyer found him in the rest home and talked to him, that's exactly what happened. I mean, he told us about his misgivings, and he didn't just tell us. He, you know, admitted to an extensive cross-examination and held up through that whole process because he strongly believed he needed to make good on the error that he, and he blamed himself, by the way, not the police, for what had been done. He strongly believed he needed to correct his inaccurate testimony or incomplete testimony. So I think there is some basis for the court to say that, you know, there is credence to that. So those are the three claims, and I guess I see that my time is nearing its end. I would just like to make two points, and one is that I really feel that the argument that the State's lawyer has presented today is an argument for the trial court, and that in the end, this appeal boils down to one and one issue. The State is making an assault on the factual findings of the district court. I respectfully disagree that the district court made clear error when it found all of these factual findings. And my final request, Your Honors, I don't even know if it's appropriate. But if it's not, I apologize. But the district court lifted the stay long ago. I mean, the writ was granted almost a year ago. The evidentiary hearing was a year and a half ago. And the district court lifted the stay, and this court imposed a stay in response to the State's emergency request for a stay.  MS. GOLDSTEIN. Is this release? MR. GOLDSTEIN. Pardon? Yes. MS. GOLDSTEIN. Is this release? MR. GOLDSTEIN. Yeah. Mr. Goldstein is going on 25 years of incarceration based on evidence that is so slim, I've never seen a case this good on my side of the law before. And I would ask this panel to consider lifting a stay that's been imposed. If the State wants to try him, they can try him. But I respectfully believe that they can't and won't try him, because they have nothing to try him on. And with that, Your Honor, I'll conclude my argument. JUSTICE KENNEDY. Well, even if they have something to try him on, they don't have their witnesses. Mr. Fink is dead. And, yeah. MR. GOLDSTEIN. Yes, sir. JUSTICE KENNEDY. So he would have to, if they tried him again, he'd have to come in and say, yes, I did recant, but I was lying then, I'm telling the truth now. And it's a pretty weak case to retry him. So when you make that argument, you're just following a form, I guess. MR. GOLDSTEIN. Well, I mean, I've never gotten a straight answer on their intention to retry him. I just can't understand how they would. JUSTICE BREYER. Well, I can tell you they can't retry him on this case, on this record. I can't tell you that, but I'd be shocked if they could. MR. GOLDSTEIN. I agree with you. JUSTICE KENNEDY. Are we in a particularly difficult situation to reverse this case? MR. GOLDSTEIN. Well, I believe two points should be made. JUSTICE KENNEDY. What do we have to find if we reverse? We have to find as a matter of law that nobody could have found as a trial code found. Don't we almost have to do that? MR. GOLDSTEIN. I think you have to find an abuse of discretion. And I would specifically point to two important factors. One is motive for Campbell to recant. We don't have to talk about it as direct recantation testimony. He's not completely changing it. He's just saying now that he had doubts. But the fact is, he also claimed that he was not coerced or had made any promises by the police officers at the time of the identification, and now he's claiming that they did. That is recantation. The district judge or the magistrate rejected our theory of the motive for recantation, buyer's remorse. He admitted 20 years later he was shocked to find out that the Petitioner was still in jail. He realized that he was responsible for that as the chief eyewitness in this case. He was never comfortable with his identification, which was brought out at trial, but now he felt guilty about that. JUSTICE GINSBURG If he believed he had testified truthfully at the first trial, then why would he feel guilty at all? Because the weight of 20 years of a man being in prison, which also is the 20 years the Petitioner used of his 25 years in prison before he came up with this theory. If he believed he had identified the correct person as the murderer, then that's what the law says. You spend that amount of time to life in prison. Now, all of a sudden, we're talking about a police conspiracy, misconduct, and everything else, and he never revealed that. At the time of trial or any time up until an investigator comes to him 20 years later, that's very suspicious. That all of a sudden you come up with this declaration with several grounds for attack on the judgment in different realms and different theories, and he never had any of this concern until an investigator comes out to talk to him. But basically, one, he rejected, and I think that's clear error, he rejected our theory of buyer's remorse. Because none of the other cases ever used that theory. And he rejected the motive for the money, the money as a motive, because he said there was no evidence to the record to support the conclusion that he had money on him. And the trial clearly pointed out that he was carrying a substantial amount of money. That is clear error. And in that case, I would also submit that it is not our fault that it took 25 years to get to this point. And it was grossly unfair to us. We couldn't find him in Arizona. We did computer checks. We checked Long Beach police personnel records. Thank you.
judges: B. Fletcher, Farris, Wardlaw